HANDOUT
11/11/04 PC mtg

## SUMMARY

This is a study of noise emissions from a gravel pit owned by Quality Asphalt & Paving (QAP). The gravel pit operation is located near mile 48 of the Parks Highway, north of Wasilla. There are several residences nearby.

The primary noise complaint comes from Mr. and Mrs. Ed Coyle of C&B Timber. The Coyle property adjoins the railroad right of way. They have a home and a small sawmill business located between the railroad tracks and the Parks Highway, just north of Vine Road. The gravel pit is immediately across the railroad tracks from this house. In particular, the conveyor station that loads gravel into railroad hopper cars is located about 140 feet away from the house.

This noise study has several goals:

- study gravel pit noise in general, and this situation in particular
- document the noises created by gravel pit operations
- document the noise levels created by traffic
- suggest potential noise control measures to protect nearby homes
- consider new regulatory noise limits

The noises coming from a gravel pit include earth moving equipment (front end loaders, dump trucks, graders), rock crushers, conveyors, an asphalt plant, various truck traffic, and generators.

Noise complaints are primarily provoked by noises that occur late at night, and activities that create loud or intermittent sound levels. A secondary factor are those noises that have a distinct character to the sound, such as the rumble from the asphalt plant when the burner is firing, or the extreme low frequency noise created by railroad locomotives on the rail siding.

When operating, gravel pit and asphalt equipment noises tend to run for long periods, often for an entire work shift. Many noisy operations continue throughout the night, and some operate continuously, twenty-four hours a day.

At the Coyle residence, many of the gravel pit noises are comparable in magnitude to trucks and cars on the Parks Highway.

Certain gravel pit noises are loud enough to exceed the limits of typical noise ordinances when measured at the Coyle residence. Therefore, the complaints about noise appear to be justified.

There are no current MSB noise regulations applicable to this area, or covering gravel pit operations in general.

## NOISE MONITORING

A series of noise measurements were made on the Coyle property and at key locations around the gravel pit. QAP was very cooperative, allowing access to the site and the equipment to get valid noise data.

A long term noise monitor was placed along the rear edge of the Coyle's property, at the approximate setback of house. The house is located directly abeam the railroad hopper car loading station. The monitor ran continuously for four straight days, starting at 2 pm on Tuesday September 14, 2004 and running until 2 pm Saturday September 18. Data was recorded for each hour of the day and night, capturing the normal day-night variations in traffic noise affecting the site. Monitoring also identified hours in which train passbys occur, and when gravel operations create potentially significant noise levels.

During the 24 hour measurements, simultaneous short-term "spot" measurements of noise were also made at selected points around the gravel pit and on the Coyle's property. Spot measurements lasted from 5-30 minutes, and help to identify specific noise sources and their momentary noise levels. Direct observations are important; the monitor logs loud and when a noise occurred, but it cannot identify what made the noise. A truck passby on the highway at 72 dBA is logged exactly the same as a load of gravel dumped into a train car at 72 dBA.

The attached charts show the collected 24 hour noise levels. The graphed data from the noise monitor shows the Leq (Equivalent Level) and both the L10 and L90 sound levels. Additional data was collected, but is not shown on the graphs for readability.

> **Leq** contains the same total sound energy as the varying noise level, divided over the entire measurement time. Leq can be thought of the "average" noise level for the hour, although that is not mathematically accurate. For environmental noise assessment, Leq is typically based on one hour time periods.
>
> **L10** is the level exceeded 10% of the hour, and is generally considered to be the loudest regularly recurring noise level, excluding exceptional momentary noises.
>
> **L90** is the level exceeded during 90% of the hour, and is considered to be the quietest repeatable background noise level, excluding unusual periods of extreme quiet and calm. This is sometimes referred to as the "noise floor" of the environment.

To illustrate, consider a residential neighborhood along a moderately busy road. L10 would be determined by the pick-up trucks and buses that normally pass by during every hour. Lmax would be an accelerating motorcycle or a fire truck siren that might only occur once or twice per hour. L90 occurs when there are momentary periods without nearby traffic or other distinct noise events, such as lulls between traffic lights.

Normally, the L10 is higher than the Leq during a given hour. In this case, there are several instances when Leq is louder. This can happen when a short but very loud event occurs, particularly toward the end of an hour. A train passby often contributes enough energy to raise the Leq for the entire hour, but does not last long enough to substantially affect the L10, which represents the loudest 6 minutes of that hour.

The sound monitor was also programmed to log "exceedances". The threshold was set to 80 dBA, and when that level was exceeded the time and duration was recorded. There were typically 0-3 exceedances per hour, which is consistent with events such as train passbys, especially loud aircraft flyovers, braking trucks on the highway, and similar sounds. During certain hours there were numerous exceedances, varying from 17 to 35 events per hour, indicating that repeated very high noise levels occurred at certain times.

According to the data, most of these exceedances occurred during one train loading cycle on Friday morning, and again during several hours on Saturday morning. Mr. Coyle has reported that during these times, larger rocks (rather than small gravel) were being dropped into hopper cars, and that the noise was noticeably louder. The noise data supports that observation.

## NOISE LEVELS AT THE RESIDENCE

A variety of short term or "spot" measurements were made to capture the levels from specific equipment and activities. Notes and observations of the individual noises were made during all measurement periods.

Normal environmental noise affecting the Coyle property include train passbys, traffic on the Parks Highway, general aviation overflights, and similar noises. The following noise levels were observed:

| | |
|---|---|
| cars on highway | 55-65 dBA |
| trucks on highway | 65-74 dBA |
| train passby | 67-80 dBA (67 dBA cars, 80 dBA locomotive) |
| aircraft | 60-78 dBA |

All noise levels were recorded at the rear setback of the house, where the noise monitor was located. By comparison, gravel pit noises at the same location were:

| | |
|---|---|
| near conveyor | 62-65 dBA |
| high conveyor | 58-62 dBA |
| asphalt plant | 58-65 dBA |
| earth movers | 58-64 dBA |
| gravel loading | 71-82 dBA |

Mr. Coyle was also provided with a loaned sound level meter, since it was not practical to have an observer on the site constantly. He made notes of the type of events, the sound level, and the time for various nighttime activities. His reported sound levels are essentially the same as my observations, and document that similar noises occur throughout the night. He was also able to document levels for certain louder events that did not occur during the site visits.

Overall, the distant gravel pit noise (roughly 500 feet or more) appears to be **Leq = 59 dBA and Lmax = 65 dBA** when measured at the Coyle's residence, without the train car loading operation. Train car loading produces noise levels averaging Leq = 71 dBA, with recurring momentary levels of 80-82 dBA. Loading a full train of seventy hopper cars takes nearly two hours. Each car takes about 90 seconds to load, while the train moves slowly past. The gravel stream is interrupted between hopper cars, while the train keeps moving.

At the Coyle property, noise from most gravel pit equipment at 500 feet or more is comparable in magnitude to other reasonably distant traffic noises. Specific observations include:

| | |
|---|---|
| asphalt plant | 58-65 dBA |
| earth movers | 55-64 dBA |
| conveyors | 58-65 dBA |
| train loading | 71 dBA typical, 82 dBA maximum |
| rock crusher | 58-65 dBA |

Noise measurements were also made for Mr. Coyle's sawmill operation. An engine driven band saw is used to saw raw trees into lumber. The saw is driven by a small 20 horsepower gasoline engine, similar to a small generator. The loudest direction from the sawmill measured 82 dBA at a distance of 20 feet. That translates to 68 dBA at 100 feet, which is comparable to a louder car or quieter truck on the Parks Highway. Noise from the sawmill should not be an issue for any nearby business or residence, since they are all several hundred feet away.

Mr. Coyle has also reported perceptible vibration inside the house associated with gravel pit activities. However, the gravel pit operations did not create any perceptible ground vibration outdoors, as observed during the site visits. Vibration was felt while standing on the deck along the back of the house, but that vibration occurred during train passbys and while were locomotives idling on the siding.

It is common for the relatively lightweight structure of a home to vibrate under the influence of low frequency sounds. We would expect the house to vibrate during a train passby, for example. People also often report low frequency noise as "vibration", given the way humans perceive sounds at the lowest end of the normal range of hearing.

## GRAVEL PIT EQUIPMENT NOISE

One of the goals of this study was to catalog noise levels from various gravel pit equipment. Noise levels were measured at specific distances such as 100 feet or 200 feet. With known noise levels and a reference distance, it is easy to predict the levels expected at other distances. To summarize, the sound levels observed were:

| | | | |
|---|---|---|---|
| | 87 dBA | 100 feet | gravel crusher, generator end |
| | 79 dBA | 100 feet | gravel crusher, finished product end |
| | 68 dBA | 100 feet | conveyor belt, including gravel drop |
| Constant? | 75 dBA | 100 feet | railroad car loading, small gravel |
| | 76 dBA | 100 feet | asphalt plant, exhaust end |
| | 91 dBA | 100 feet | asphalt plant, burner end |
| | 80 dBA | 100 feet | front end loaders, trucks, graders |

Note that these noise levels are corrected to a 100 foot reference distance. Do not be confused by other numbers that may appear for the same sources elsewhere within this report; that data refers to a noise level at a specific location.

The "overall" gravel pit noise can be characterized as 68 dBA measured at a distance of 800 feet. This is based on direct line-of-sight to the major noisy equipment, including the asphalt plant, earth movers, and rock crushers. This overall noise level can be used for a preliminary analysis for future gravel pit projects. In general, noise should be evaluated whenever a gravel operation occurs within 1000 feet of a home. Note that potentially beneficial effects have not been included, such as using gravel piles as a noise barrier or placing equipment in depressed pits.

Noise typically decreases at a rate of 5-6 decibels per doubling of the distance. For example, noise at 80 dBA when measured at 100 feet would become 74 dBA at 200 feet, 68 dBA at 400 feet, and so forth. This decrease is due to distance only. Additional reductions can be provided at significant distances by heavy vegetation, intervening terrain or buildings, and atmospheric effects. Usually wind direction and temperature inversion effects are not significant until the distance from the noise source is one-half mile or more.

## EXISTING NOISE LIMITS

We have worked extensively with Borough staff on various specific noise problems over the past several years. This has resulted in a noise ordinance for the core area, codified as MSB 17.61.080. The allowable noise levels at the affected property line are keyed to the type of land use, and for the time of day for noise affecting residential

properties.

At residences, the daytime limit is 60 dBA and the nighttime limit is 50 dBA. These noise limits are applicable for the entire hour, as an Leq. In addition, there is an adjustment for intermittent noises. The basic daytime limits are increased by 5 decibels for up to 15 minutes of a given hour, increased by 10 decibels for 5 minutes of any given hour, and increased by 15 decibels for 1 minute in any given hour. These adjustments cover short term loud events that would tend to cause noise complaints, in addition to the average noise for the hour.

At commercial and industrial property, the limits are dependent on the adjoining land use. The limits are 70 dBA, 75 dBA or 80 dBA depending on the adjacency.

These noise limits are fairly typical, and have been adopted by many communities across the country. Some jurisdictions are more lax, and some are stricter. Some areas may exempt certain activities. For example, a ski resort area might specifically exempt nighttime noise from snow-making and snow grooming equipment.

It is also common to adopt stricter limits on particular noise sources or activities, in addition to the general limits of the overall ordinance. Sometimes the ordinance with prohibit an activity entirely in certain areas, or limit the allowable times of operation.

For example, the MSB noise ordinance was recently supplemented by additional regulations affecting amplified music from nightclubs, which was a specific noise source requiring special attention.

Nighttime is generally defined as 10 pm to 7 am. It is usually prudent to have stricter noise limits at night when people are normally trying to sleep. In fact, nighttime noises are the primary cause of complaints. MSB 17.61.080 adjusts the applicable noise limit times slightly for certain situations, such as weekends and during construction season.

## POSSIBLE NOISE REGULATION

There is no current noise regulation applicable to gravel pit operations within the Borough. However, similar situations are quite likely to arise again, where an industrial activity such as a gravel pit is located next to residences. In anticipation of future problems, the Borough wants to consider possible noise limits.

A balance is necessary to provide reasonable protection for noise affecting dwellings, versus the need for a gravel pit to respond to their customer's needs. During the construction season, gravel pits often need to run extra shifts or more asphalt batches to keep up with high demand for gravel and asphalt products. Unfortunately, the summer construction season is also the time when homeowners will most likely be disturbed by noise. Warm nights often make it necessary to sleep with opened windows, and homeowners spend more time outdoors during the long summer days.

In general, noise regulations can take several different approaches:

Set specific limits for noise affecting different land use zones
Specific and well-defined limits are the most clear-cut to interpret and enforce. For example, when the noise created by a new source is 51 dBA and the limit is 50 dBA, there is a violation.

Some ordinances allow an average between two immediately adjoining land uses. Residential property (50 dBA noise limit) that shares a common property line with commercial property (60 dBA noise limit) will sometimes allow for 55 dBA as a compromise noise limit. Beyond the immediately adjacent residential property, the original 50 dBA limit would apply.

Limit the amount of change that can be occur before and after
The differential approach can be useful for both very quiet and very loud areas. When the background noise level is 35 dBA at night, allowing 50 dBA would still create an adverse impact; a fifteen decibel increase is simply too much change in the noise environment.

Conversely, there is little point to regulating a noise source to 50 dBA when the traffic noise is already 62 dBA at a given location. Even if that noise were in compliance, it would be difficult to demonstrate, because the ambient noise is louder.

Limit specific types of noise
Many communities find it workable to simply list specific noises that will be regulated, limited or prohibited. It is common to place a stricter limit on sources such as watercraft, leaf blowers, snow removal, public address systems, electrical transformers, construction sites, etc.

The main drawback to placing additional noise restrictions on certain activities is the sometimes subjective nature of what gets regulated, often leading to accusations of unfairness toward a specific source. The other drawback is that the governing agency must list all of the sources that it intends to regulate, which can sometimes get unwieldy.

In the general case of gravel pits and similar industrial activities, the basic core area noise limits should probably be adopted as the standard for noise affecting residential areas. When numerous homes are affected, the prudent course is to have stricter

limits to protect the greater number of affected people. This is especially true for new development - either a new gravel pit going in next to an existing residential area, or vice versa.

For the case of new gravel pit next to existing residential development, the suggested noise limits should be standard, ie:

daytime 60 dBA nighttime 50 dBA

For the case of new residential development next to existing gravel pits, the suggested gravel pit noise limits should be slightly more lax:

daytime 65 dBA nighttime 55 dBA

This splits the difference between a commercial and residential limit, and favors the pre-existing land use. There is precedent within noise ordinances for this approach.

In this particular case at Mile 48, the two properties could both be considered commercial in nature, although there is a residence on one parcel. If the Coyle property is deemed residential, then the standard residential limits should probably apply. If the property is designated as commercial, the corresponding commercial noise limits should be applicable.

A compromise noise limit of 65 dBA during the day and 55 dBA at night will protect the homeowner against the worst noise impact and still allow the gravel pit to operate mostly unimpeded during the daytime hours (7 am to 10 pm). The adjusted noise limit also seems reasonable given the relatively high pre-existing noise from Parks Highway traffic and the adjoining railroad tracks.

The main adverse effect on the gravel pit would be the restriction on the noisiest activities during the night. These activities include train loading, rock crushing from nearby equipment, and the loading of railroad ballast gravel.

Note that no noise ordinance purports to guarantee satisfaction, or provide silence at a given location, or prohibits any audible or noticeable effect. The noise ordinance merely reflects the locally defined standard for "reasonable and acceptable" noises. There may still be noise complaints, even though all numerical standards are met.

## POTENTIAL NOISE MITIGATION MEASURES

There are several things that a gravel pit can do to minimize their noise emissions affecting the surrounding neighborhood. Some of the most likely options include:

- restricting nighttime operations (after 10 pm or before 7 am)
- using large semi-permanent gravel piles as noise barriers between noisy equipment and nearby homes
- erecting noise barriers (walls) between certain noisy equipment and the nearest property line
- placing noisy equipment such as rock crushers and asphalt plants below grade in excavated pit areas
- placing noisy equipment as far as possible from homes, or close to already noisy areas such as the highway
- scheduling railroad loading operations during the daytime hours
- locate the railroad siding as far as possible from homes
- purchase the nearest impacted residential parcels

Some of these measures may be feasible and practical, while others may not work well operationally. Each individual case will require some thought about equipment placement and times of use.

Having a codified noise limit for future gravel pits will compel the gravel pit operators to consider noise issues when planning a new operation. They will have a known noise limit to work against, rather than taking their chances with some unknown future complaint.

**CONCLUSIONS**

Gravel pit noise will adversely affect homes if they are close enough to the source, and especially for noisy operations that occur at night.

In this specific case, noises emanating from the QAP gravel pit and asphalt operation does create noise levels at the Coyle residence that would exceed most noise ordinances.

Noise limits should be adopted to provide a reasonable degree of protection for homeowners.

Although noise limits will place corresponding restrictions on gravel pit operators, they

Murph O'Brien - gravel pit noise - draft .doc
Page 10

Gravel Pit Noise Evaluation
Parks Highway, Mile 48

October 7, 2004
page 10

also benefit from knowing the applicable limits, and can consider noise concerns, during future development and expansion plans.

Noise mitigation measures can be adopted by the gravel pit, but not without some impact on operations. The most direct solution is to limit certain noisy operations during the nighttime hours.

EXHIBIT 4
Page 10 of 13

Page 11

Gravel Pit Noise Evaluation
Parks Highway, Mile 48

October 7, 2004
page 11

24 hour noise monitor, TUE 14 SEP
decibels
80
75
70
65
60
55
50
45
40
0000
0200
0400
0600
0800
1000
1200
1400
1600
1800
2000
2200
time
L10
Leq
L90

24 hour noise monitor, WED 15 SEP
decibels
80
75
70
65
60
55
50
45
40
0000
0200
0400
0600
0800
1000
1200
1400
1600
1800
2000
2200
time
L10
Leq
L90

EXHIBIT 4
Page 11 of 13

Page 12

Gravel Pit Noise Evaluation
Parks Highway, Mile 48

October 7, 2004
page 12

24 hour noise monitor, THU 16 SEP
80
75
70
65
60
55
50
45
40
decibels
0000
0200
0400
0600
0800
1000
1200
1400
1600
1800
2000
2200
time
L10
Leq
L90

24 hour noise monitor, FRI 17 SEP
80
75
70
65
60
55
50
45
40
decibels
0000
0200
0400
0600
0800
1000
1200
1400
1600
1800
2000
2200
time
L10
Leq
L90

EXHIBIT 4
Page 12 of 13

Murph O'Brien - gravel pit noise - draft ... c Page 13

Gravel Pit Noise Evaluation
Parks Highway, Mile 48

October 7, 2004
page 13

24 hour noise monitor, SAT 18 SEP
decibels
80
75
70
65
60
55
50
45
40
0000
0200
0400
0600
0800
1000
1200
1400
1600
1800
2000
2200
time
L10
Leq
L90

EXHIBIT 4
Page 13 of 13