IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT PALMER

| | |
|---|---|
| DeETT A. COYLE, and EDWARD COYLE, <br><br> Plaintiffs, <br><br> vs. <br><br> COLASKA, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) Case No. 3PA-05-1388 CI ) ) ) ) ) |

## AFFIDAVIT OF JON FUGLESTAD

STATE OF ALASKA            )
                                        )ss.
THIRD JUDICIAL DISTRICT )

JON FUGLESTAD, being first duly sworn upon oath, deposes and states as follows:

1. I am the Vice President and General Manger of Colaska, Inc. in Anchorage, which does business as both QAP and Aggpro.

2. Colaska is the owner and operator of the Meadow Lakes Gravel Pit which is the subject of the plaintiffs' Complaint in this matter.

3. I make this affidavit based upon personal knowledge of the business operations of Colaska, Inc., and from the documents that this company keeps in the ordinary course of its business.

4. As was stated in our original Opposition to the Plaintiffs' Motion for Expedited Consideration of Application for Preliminary Injunction, Colaska, Inc. has ongoing projects with the Alaska Department of Transportation and Public Facilities (ADOT/PF) that are being entirely supplied by the Meadow Lakes Gravel Pit in issue, which is Colaska's only operational pit which can supply these projects. The aggregate contract values of these projects exceed Fifty Million Dollars.

5. In addition to the contracts Colaska has with the ADOT/PF, Colaska also supplies concrete to various customers and state construction projects throughout Anchorage. All of the aggregates which are used to make the concrete we sell come from the subject gravel pit.

6. Based upon current customer orders and projects for which our concrete is being used, we predict the sale of an additional 20,000 cubic yards of concrete to be sold this season. This concrete is sold at an average of $105 per cubic yard which would generate approximately $2,100,000. This material is supplied to customers Home Depot, Bristol Bay Native Corporation, the Corps of Engineers among others, and for the Northern Lights Project, the Ship Creek Bridge Project, the Tudor Road Project and others.

7. Colaska is under contract to provide concrete to some of these outside customers which contracts were entered into in order to ensure our customers that they would have materials within specific time frames for their own projects.

8. These projects, and customers, therefore, have their own scheduled time frames this year within which they must have the concrete we supply to them, and if we are unable to supply the concrete to them, they will go to another competitor, such as Anchorage Sand &

Affidavit of Jon Fuglestad
Coyle v. Colaska, Inc.; Case No. 3PA-05-1388 CI
Page 2 of 7

Gravel, to purchase that concrete — assuming Anchorage Sand & Gravel is capable of fulfilling their needs.

9. Because of our need to supply our own projects which are discussed below, if we are precluded from operating two trains per day from the subject gravel pit, which will occur if we are precluded from operating from 9 p.m. to 8 a.m. Monday through Friday and from operating at all on Saturday, we will be forced to stop importing gravel for our concrete sales, and will be required to import only materials to support our own projects. This would result in the loss of concrete sales alone in the Two Million Dollar range — depending on when the injunction would go into effect.

10. Furthermore, we would be placed in a position of breaching contracts we have with customers, and exposing ourselves to liability for sums equaling the difference between what our customers are forced to pay elsewhere, and what they have contracted with us to pay. There are other consequential damages these customers could suffer, which they could seek to recover from us, but those cannot be known at this time.

11. In addition to the loss of our concrete sales, we will suffer losses in the range of $60,000 on the Parks Highway Project alone, if precluded from operating from the pit from 9 p.m. to 8 a.m. Quite separate from loading a gravel train to haul materials to our C Street plant in Anchorage, we also manufacture asphalt for the Parks Highway Project presently underway. With the agreement of the ADOT/PF, we are paving at night, because it is less disruptive to traffic on the Parks Highway to do so, and it is far cheaper to haul asphalt at night, and it is more efficient with larger production of paving at night than during the day. If this court were to enjoin

all operations between 9 p.m. and 8 a.m., our paving on the Parks Highway job would stop. That would necessitate developing a new daytime schedule for paving with the ADOT/PF and would increase our haul costs by several dollars per ton because of the additional delays in daytime delivery of materials due to traffic and traffic control. There is approximately 30,000 tons left to pave on the Parks Highway Project, and at a conservatively estimated $2.00 per ton in increased costs, our increased haul costs would be $60,000.

12. We would similarly lose an economy of scale because of the delays of paving during the day time, and would either need to hire additional trucks to haul the same amount of material during the same number of hours, or alternatively, increase the length of time in the daily costs for our spread of equipment for the additional days it would take to complete paving on that project. I cannot in this limited time frame estimate what the additional spread of equipment would cost on a daily basis for the number of days of delay -- which would again depend in part on when such an injunction might be issued.

13. In addition to the loss of approximately Two Million Dollars in concrete sales and $60,000 in haul costs alone for the Parks Highway Project, Colaska would be seriously damaged from its inability to complete its existing projects in Anchorage by the contract deadlines.

14. Colaska has until August 31, 2005 within which to complete its Tudor Road Project. It needs 6,203 tons of borrow, 2,048 of asphalt concrete V, and 12,123 tons of asphalt concrete VH. This amount of material corresponds to approximately 10,000 tons of gravel per

Affidavit of Jon Fuglestad
*Coyle v. Colaska, Inc.*; Case No. 3PA-05-1388 CI
Page 4 of 7

plan quantity. There are additional tons of asphalt concrete IIB and IVB which are needed, but I cannot specify those tonnages at this time.

15. Our Taxiway R needs 20,000 tons of borrow, 230 tons of asphalt concrete Type 1 and 3,375 tons of asphalt concrete Type 3 which corresponds to approximately 25,000 tons of gravel per plan quantity.

16. South Air Park Project which must be completed by October 31, 2005 requires 465 tons of borrow, 17,000 tons of C2 and 18,600 tons of asphalt concrete. This project must be completed by October 31, 2005, however, hauling the remaining borrow must be complete in approximately 10 days, and the C2 must be crushed in approximately 10 days in order to complete the phases which must be completed in order to complete the project by its contract deadline.

17. Our C Street Extension Project does not have a completion date until early 2006, but requires approximately 40,000 tons to be delivered to the project in 2005 in order to keep it on schedule to be completed by the completion date in 2006.

18. If we are permitted to only run one train per day to August 31, 2005, that would equate to 15 trains at 8,000 tons each, or the importation of only 120,000 tons of gravel. This would leave us short 43,500 tons of gravel that we need within the next two weeks to complete our projects on a timely basis. As a practical matter, so as not to subject ourselves to liquidated damages on all four of these projects, we would probably be forced to sacrifice materials that are needed to complete the C Street Extension in a timely way, and probably also South Air Park, and instead use the materials that we have to at least complete Tudor Road and Taxiway R. This could possibly limit our exposure to liquidated damages to only two projects

Affidavit of Jon Fuglestad
Coyle v. Colaska, Inc.; Case No. 3PA-05-1388 CI
Page 5 of 7

instead of four, but this does place us in breach with the ADOT/PF on two separate contracts even if we were successful in mitigating our damages in this fashion. Our failure to finish South Air Park by October 31, 2005 would subject us to liquidated damages of $1,500 per day for approximately 200 days or $300,000.

19. The Tudor Road Project would probably be delayed by approximately 60 days from its 2006 contract completion date. Liquidated damages on that project are $2,500 per day for approximately $150,000.

20. There are incidental and collateral damages, such as claims by subcontractors who provide street lighting, curb and gutter installation, electric and other trades that would be delayed as a consequence of our delay. Each of these subcontractors would have damages for delay against Colaska, to the extent their own costs were increased as a result of our delays in completing within the contract frames we are required to do so, or within the time frames we informed the subcontractors they could commence their work.)

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
JON FUGLESTAD

SUBSCRIBED AND SWORN TO before me this ___15___ day of August, 2005.

_____
Notary Public in and for Alaska
My Commission Expires: 08/18/06

Affidavit of Jon Fuglestad
*Coyle v. Colaska, Inc.*; Case No. 3PA-05-1388 CI
Page 6 of 7

**Certificate of Service**
This is to certify that a true and correct copy of the
foregoing document was filed and served by facsimile
and U.S. Mail on the 15th day of August, 2005, to the following:

(907) 746-8108
Clerk of Court
Palmer Courthouse
435 S. Denali Street
Palmer, AK  99645

(907) 747-2662
Melinda D. Miles, Esq.
William F. Tull & Associates
634 South Bailey Street #201
Palmer, AK  99645

_____
Keena Lukacinsky, Legal Assistant

Affidavit of Jon Fuglestad
*Coyle v. Colaska, Inc.*; Case No. 3PA-05-1388 CI
Page 7 of 7