Brewster H. Jamieson, ASBA No. 8411122
LANE POWELL LLC
301 West Northern Lights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone: 907-277-9511
Facsimile: 907-276-2631
Email:      jamiesonb@lanepowell.com
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| DEETT A. COYLE and EDWARD COYLE,<br><br>                     Plaintiffs,<br><br>v.<br><br>COLASKA, INC.; and ALASKA RAILROAD CORPORATION,<br><br>                     Defendants, | Case No. 3:05-cv-00221-TMB<br><br>**MOTION FOR RECONSIDERATION<br>OF DECEMBER 10, 2007, ORDER** |

Defendant Alaska Railroad Corporation ("ARRC"), by and through counsel, hereby moves the Court pursuant to LR 59.1 to reconsider its November 10, 2007, Order Re: Docket Nos. 21 and 39 ("Order"; *see* Docket 62) for the reason that the Court has overlooked or misconstrued material facts which, by the Court's own holding, would result in the reversal of the Order.

    1.    **Colaska Did Not Unilaterally Perform The Gravel Loading.**

To support its holding, the Court found: "Colaska ... loads its own gravel into ARRC's railcars." Order, p. 6. This finding overlooks directly contrary facts in the record. The Court took judicial notice at the oral argument on November 6, 2006, that while the gravel is falling from the tipple located over the cars, ARRC crews are moving the cars underneath the tipple. <u>Both</u> functions—i.e., operation of the tipple and ARRC moving the cars—must be performed simultaneously in order to load the gravel into the cars. *See* the following portions of the transcript of the November 6, 2006, oral argument, attached as Exhibit A.

> THE COURT: ... Isn't there a difference, though, if it's your stairway versus a private company's stairway? ***Because this tipple and the act of loading the gravel is not the railroad's activity; it's a private company's activity.***

> MR. JAMIESON: *Well, actually, that's an incorrect assumption*, and I apologize if the facts aren't clear. But it takes two to tango; it takes two to load. *You can't load these cars without the cars being underneath and being moved by the Alaska train crews. The tipple doesn't function except when the cars are underneath it receiving gravel.*

Transcript of Oral Argument, p. 15 ln. 3-17 (emphasis added).

> MR. JAMIESON: ... So this falls -- the tipple and the equipment that is involved in operation of the tipple and the equipment that's involved in operation of the train, the gravel, is squarely transportation. *And that occurs as a coordinated effort, as an integrated effort by Colaska on one hand and the Alaska Railroad on the other.*

Transcript of Oral Argument, p. 18, ln. 11-18 (emphasis added).

> MR. JAMIESON ... *The railroad participates; it has to. You can't turn the tipple on without having a moving rail car underneath it.*
>
> The operation is a well-oiled machine and it requires close coordination between the tipple and the train crew. The train crew moves at a very slow rate of speed underneath the tipple and then the tipple is turned on as the beginning of the open rail car comes directly underneath it, and then it proceeds along the line to the rail car and then stops for the gap between rail cars and then commences again and it fills up the next car and moves very slowly as the train is moving the entire time. It's being operated by train crews the entire time. And that is exactly how this operation occurs.

Transcript of Oral Argument, p. 27, ln. 5-21 (emphasis added).

> MR. PERKINS: ... And I don't think that -- first of all, there's no evidence in the record that there has to be a moving railroad that's loaded. I mean, that may intuitively ring true, but I don't know. There's no evidence on that, so does there have to be an engineer pulling a load forward so that they have to go on and off the tipple as they pull forward? I don't know.

Transcript of Oral Argument, p. 30 ln. 3-10.

> MR. JAMIESON: ... and are limiting the proffer just based on the last item that Mr. Perkins indicated might be in dispute. I think he indicated that it was intuitively true that you would have to have a moving rail car in order for the tipple to load the cars. If you would like, Your Honor, we can put Mr. Hupprich on the stand and he's --
>
> THE COURT: *You know, I think I can figure out that to load one car you've got to find a way to load the second car. I don't think that's an issue.*
>
> MR. JAMIESON: Right. I don't think so either, Your Honor, but if you wanted to ask questions of Mr. Hupprich about the operation, he has observed it and he can testify with first-hand knowledge about it.
>
> THE COURT: *I don't think that's necessary.*

Transcript of Oral Argument, p. 32 ln. 13 – p. 33 ln. 6 (emphasis added).

**Motion For Reconsideration of December 10, 2007, Order at Docket 62**
*Coyle v. Colaska, Inc., et al.* (Case No. 3:05-cv-00221-TMB)   Page 2 of 5

LANE POWELL LLC
301 West NorthernLights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511   Facsimile 907.276.2631

Further, if Mr. Hupprich had been allowed to take the stand during the oral argument, he would also have testified that while ARRC crews operate the train underneath the tipple during the gravel loading operation there also is an ARRC employee, the train conductor, actually in the tipple control tower along side the QAP tipple operator. *See* Third Declaration of William R. Hupprich, Exhibit B. The conductor is in radio contact with the train engineer and instructs the engineer to speed up or slow down the train based on the volumes of gravel being dumped into the cars. *Id.*

Therefore, the undisputed fact is that ARRC played an active and equal part in loading the gravel. For this reason, *Hi-Tech Trans, LLC v. New Jersey*, 382 F.3d 295 (3rd Cir. 2004), and *Grafton & Upton R.R. Co. v. Town of Milford*, 417 F. Supp. 2d 171 (D.Mass. 2006), cited in the Order, are inapposite because in both of those cases—unlike ARRC in the instant case—the rail carrier played no part in the operation of the loading facility. *See Hi-Tech* at 308 ("Thus, the License Agreement essentially eliminates CPR's [i.e., the rail carrier] involvement in, and responsibility for, the operation of Hi Tech's facility."); *Grafton* at 177 (the STB had found that the rail carrier's involvement "would be limited to transporting rail cars for BRT [i.e., the non-rail entity] and leasing some of its surplus property," while BRT "would control the functions of unloading the rail cars, handling and (in some cases) fabricating the shipped steel, and then trucking it to customers").

Therefore, in light of the undisputed fact of ARRC's essential involvement in the gravel loading operation, the Court is respectfully requested to reconsider and reverse the Order.

**2.     If The Tipple Were Closed, The Side Track Would Shut Down.**

The Order also found: "ARRC has stated that it used the side track for other purposes, including storing other rail equipment there during the winter." Order, p. 6. This finding overlooks the following undisputed facts established by the uncontradicted evidence and the Declaration of William R. Hupprich[1]: First, that the purpose for constructing the industry track from ARRC's main track to the tipple was to serve the gravel loading operations of the tipple. *See* Hupprich Declaration at ¶ 3, and Industry Track Agreement between ARRC and Colaska (Exhibit B to ARRC's Motion for Partial Summary Judgment, Docket 21). Second, and most importantly, if the gravel loading operation in the pit were permanently enjoined as sought in the complaint, the effect would be to shut

---

[1] The signed original of Mr. Hupprich's declaration was filed with this court in support of ARRC's Motion to Intervene as a Party Defendant (Docket 7); a copy was also filed with ARRC's Motion for Partial Summary Judgment (Docket No. 21).

LANE POWELL LLC
301 West NorthernLights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511 Facsimile 907.276.2631

down ARRC's property and railroad transportation operations at the gravel pit. Hupprich Declaration at ¶ 5. Third, the closing of the track would have significant direct economic impact to ARRC. *Id.*

Therefore, any finding that ARRC would use the side track for other purposes if the tipple closes is in error. It is an undisputed fact that closing the tipple would result in completely shutting down the side track, and the Court is respectfully requested to reconsider and reverse the Order in light of this undisputed fact.

In addition, there is no support for the legal principle relied on by this portion of the Order. That the track may be used for some purposes at the present time does not mean that state law may be used to regulate other uses of the track. The ICCTA applies to all attempts to regulate railroad transportation and facilities which fall within the scope of that statute. Nothing under the law holds that the tipple cannot be an "integral facility" unless the sole and exclusive use of ARRC's tracks at the gravel pit was to serve the tipple. If the tipple is an "integral facility" otherwise subject to the ICCTA, it does not fall out of that statute merely because ARRC sometimes parks trains on the side track.

### 3.  Regulating The Tipple Would Regulate ARRC's Operations.

The Order also reasoned: "the Coyles have affirmatively stated that they do not wish to regulate ARRC's operations and have expressed an interest in those operations continuing." Order, p. 6. However, the Order overlooks that this statement is completely contradicted by the undisputed facts in the record. In granting ARRC's motion to intervene in this matter, the Court ordered that paragraphs 10-16 of the Second Amended Complaint, which deal with the tipple and gravel pit operations, applied to ARRC. *See* November 21, 2005, Order (Docket 13). By order of the Court, plaintiffs are, in fact, seeking a permanent injunction against ARRC's operations at the gravel pit. If the plaintiffs are granted the permanent injunction, the effect on ARRC's tracks will not only be substantial, it will be total. Again, as noted above, it is undisputed that permanently enjoining the use of the tipple would result in ARRC's shutting down its operations at the gravel pit. Whether or not plaintiffs intended to prevent ARRC's use of its tracks (and the issue of intent is irrelevant) it is simply factually undisputed that the actual effect of the plaintiffs' claims would be to prevent ARRC from using its tracks and equipments at the gravel pit. Shutting down ARRC's track is "regulation"

LANE POWELL LLC
301 West NorthernLights Boulevard, Suite 301
Anchorage, Alaska 99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

of a rail carrier under any interpretation of the ICCTA. Therefore, the Court is respectfully requested to reconsider and reverse the Order in light of the undisputed fact that the relief sought by plaintiffs will as an undisputed fact shut down ARRC's side track at the gravel pit.

## CONCLUSION

For the reasons stated above, the Court is respectfully requested to reconsider and reverse the Order.

DATED this 16th day of January, 2007.

>LANE POWELL LLC
>Attorneys for Alaska Railroad Corporation
>
>By  s/ Brewster H. Jamieson
>301 West Northern Lights Boulevard, Suite 301
>Anchorage, Alaska  99503-2648
>Tel:    907-277-9511
>Fax:    907-276-2631
>Email: jamiesonb@lanepowell.com
>ASBA No. 8411122

I certify that on January 16 2007, a copy of the foregoing was served by ECF on:

Douglas C. Perkins, Esq.  dp@hartig.com
David J. Schmid, Esq.  schmid-law@gci.net

  s/ Brewster H. Jamieson
113951.0010/158546.1

**LANE POWELL LLC**
301 West NorthernLights Boulevard, Suite 301
Anchorage, Alaska  99503-2648
Telephone 907.277.9511  Facsimile 907.276.2631

**Motion For Reconsideration of December 10, 2007, Order at Docket 62**
*Coyle v. Colaska, Inc., et al.* (Case No. 3:05-cv-00221-TMB)                                      Page 5 of 5