1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF ALASKA AT ANCHORAGE

3

4   DEETT A. COYLE and EDWARD COYLE,    )
                                        )
5            Plaintiffs,                )
                                        )
6   v.                                  )
                                        )
7   COLASKA, INC.; and ALASKA RAILROAD  )
    CORPORATION,                        )
8                                       )
             Defendants.                )
9   _____ )
    Case No. 3:05-cv-00221-TMB
10

11

12        ORAL ARGUMENT - November 6, 2006

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT A**

Page 2

```
 1        A P P E A R A N C E S
 2  FOR PLAINTIFFS:
 3  HARTIG RHODES HOGE & LEKISCH
    717 K Street
 4  Anchorage, Alaska  99501
    BY:  DOUGLAS C. PERKINS
 5
 6  FOR COLASKA, INC.:
 7  DAVID J. SCHMID
    Attorney at Law
 8  500 L Street, Suite 503
    Anchorage, AK  99501
 9
10  FOR ALASKA RAILROAD CORPORATION:
11  LANE POWELL, LLC
    301 West Northern Lights Boulevard
12  Suite 301
    Anchorage, AK  99503-2648
13  BY:  BREWSTER H. JAMIESON
         BRAD AMBARIAN
14
15  ALSO PRESENT:
16  BILL HUPPRICH, IN-HOUSE COUNSEL,
    ALASKA RAILROAD CORPORATION
17
18
19
20
21
22
23
24
25
```

Page 3

1        THE CLERK:  All rise.  United
2  States District Court for the District of Alaska
3  is now in session, the Honorable Timothy M.
4  Burgess presiding.  Please be seated.
5        THE COURT:  Good morning.  We are
6  here today in the matter of Coyle versus
7  Colaska, Inc., et al., Case No. 05-Civil-221.
8  And we are here on a couple motions.  There's a
9  motion for partial summary judgment that was
10  filed by the railroad and joined by Colaska, and
11  then there's a cross-motion for remand to State
12  court filed by the Coyles.
13        And so I'll give you my proposal
14  on how to proceed for purposes of oral argument.
15  But, first, why don't you introduce yourselves
16  and everybody here so I know who's who.
17        MR. PERKINS:  Thank you, Your
18  Honor.  I'm Doug Perkins.  Mr. Coyle is here
19  with me today.
20        MR. COYLE:  Good morning.
21        MR. JAMIESON:  Good morning,
22  Your Honor.  Brewster Jamieson on behalf of the
23  railroad.  With me is Bill Hupprich, in-house
24  counsel for the railroad, and my colleague, Brad
25  Ambarian, is also here today.

Page 4

1        MR. SCHMID:  Dave Schmid on
2  behalf of Colaska, Inc.
3        THE COURT:  All right.  Well,
4  good morning.  Here's what I thought, and you
5  can tell me if you have some different
6  suggestions.  But what I thought we'd do is just
7  divide this up and give each side, plaintiffs
8  and defendants, half an hour.  And since we're
9  dealing with a principal motion and a
10  cross-motion, what I thought was we would start
11  off with -- actually with -- it seems to me that
12  the motion -- this particular motion practice,
13  start off with Mr. Jamieson's motion.  So I
14  would give you a half an hour.  You can -- for
15  defendants to argue that motion, as well as the
16  opposition to plaintiffs' motion.  Then you can
17  reserve some of that half an hour for responding
18  to plaintiffs' argument.
19        Give you a half an hour, same
20  thing, for arguing your opposition to their
21  motion and, your motion, and you can reserve some
22  of that time.  And as far as your half hour, you
23  all can divide that up any way you want.  I
24  don't know if one of you plans to argue, you
25  know, or if both of you plan to argue.  If you

Page 5

1  want a minute to talk...
2        MR. JAMIESON:  It will be just
3  me, Your Honor.
4        THE COURT:  You just conferred
5  and that works?  Okay.  Thank you.  That was
6  what it looked like to me from the way I was
7  reading the pleading, so...
8        All right.  So why don't we then
9  start off with Mr. Jamieson.  You've got a half
10  hour.  Do you want to reserve some of your time
11  for a reply?
12        MR. JAMIESON:  Yes, Your Honor,
13  although I anticipate taking less than half an
14  hour.
15        THE COURT:  Well, you know, and
16  let me just say, you know, just because you have
17  a half an hour doesn't mean you have to use a
18  half an hour.
19        MR. JAMIESON:  I can reserve part
20  of my half an hour to talk about the football
21  games yesterday, but that would probably not be
22  a good use of time.
23        THE COURT:  Well, you know, it
24  all depends on who you're rooting for.
25        MR. JAMIESON:  I'll keep that to

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

Page 6

1  myself, Your Honor.  I don't want to create any
2  animosity where there might not otherwise be.
3          THE COURT:  I just hope you're
4  not an Oakland fan because they're playing
5  tonight.
6          MR. JAMIESON:  No.  It's safe to
7  say I'm not an Oakland fan.  Thank you.
8          Again, Brewster Jamieson, for the
9  record, for the railroad.  Your Honor, it
10  appears that both motions will be decided by a
11  single issue of law, and that is whether there
12  is jurisdiction under 49 USC Section 105.01.
13  That would serve -- if your finding is, yes,
14  there is jurisdiction, then that is sole,
15  exclusive, preemptive jurisdiction that both
16  would defeat the remand and would impel this
17  Court to -- to refer this matter -- dismiss this
18  matter in favor of the Surface Transportation
19  Board.  So that is a single issue of law that
20  covers both, and that is what I'm going to
21  primarily focus my remarks on, is that single
22  issue of law.
23          Let's talk a little bit about the
24  facts, the tipple and what the tipple is.  We
25  can -- I took the liberty of asking the Court

Page 7

1  staff to set up the DEP system so that we can
2  actually look at pictures, because I think
3  they're very helpful, and I'd like to compliment
4  the Court staff on accommodating my request as
5  late as it was.
6          THE COURT:  They're good.
7          MR. JAMIESON:  They are good.
8  And this is not a very good picture to begin
9  with, but you can see this is the area we're
10  talking about.  The -- this says -- I don't know
11  if you can read it.  It says, Tipple Permit
12  Area, and it's 52,544 square feet on the Alaska
13  Railroad's right-of-way.  And there are two
14  components that we are talking about in this
15  case.  The first component is this loading
16  track.
17          THE COURT:  The side track?
18          MR. JAMIESON:  Yes, the side
19  track, loading track.  It is a -- this is the
20  main line or these are the main lines, and then
21  there's this side track where an 80-car train
22  can proceed underneath a tipple located roughly
23  in the middle and accept the load.  The tipple
24  itself is a piece of equipment located -- it's
25  multi-faceted.  We'll look at it in the pictures

Page 8

1  in a minute.  But it's located entirely within
2  the right-of-way, the Alaska Railroad
3  right-of-way, and it's a permit that allows
4  Alaska to have that piece of equipment there.
5          And the only thing that that
6  piece of equipment does is load gravel into
7  Alaska Railroad cars.  Those cars at time of
8  loading are being operated by the Alaska
9  Railroad, the train, when those cars are being
10  loaded.
11          THE COURT:  I understand that
12  there's a permit that permits the tipple to be
13  there, but the ownership of the tipple is not in
14  question.
15          MR. JAMIESON:  The ownership of
16  the tipple is -- it is owned, the actual
17  equipment itself is owned by Colaska under, I
18  believe, the ownership of the tipple is
19  irrelevant under Section 101.29b which is the --
20  which gives you the definition of
21  transportation, and it applies to equipment
22  regardless of ownership so long as it's used in
23  rail transportation.
24          The tipple itself is constructed
25  directly adjacent to, over and around the

Page 9

1  railroad tracks.  This is a picture -- let's see
2  if I can zoom out a little bit.  This is a
3  picture -- you can see the main tracks are here.
4  This is where the tipple delivers the gravel
5  into Alaska Railroad cars.  This is a picture of
6  -- we go now to a picture of the tipple.
7          By the way, for the record, I'm
8  referring to Exhibit A of Bill Hodge's second
9  affidavit.  These are already part of the
10  record, Your Honor, and I'm looking at Pages 3
11  of 3 -- or 3 of 4 of Exhibit A to that
12  deposition.
13          Here's another photograph which
14  depicts the tipple from the opposite angle.  You
15  can see the tracks curve over into the main
16  line.  And then this shows the -- the next
17  photograph shows the tipple actually in
18  operation.  And you can see that it dumps the
19  gravel directly into the Alaska Railroad cars.
20          And so it is our contention that
21  this piece of equipment configured as it is and
22  with the sole purpose of loading/unload -- or
23  actually just loading gravel into Alaska
24  Railroad's cars in an operation that requires
25  both Colaska and Alaska Railroad employees to

Page 10

1  operate in concert in order to make that happen
2  is subject to 49 USC 105.01.
3        The focus of the lawsuit, the
4  underlying lawsuit, is the tipple.  I think Mr.
5  Coyle has indicated that his beef is not so much
6  with the gravel pit, which was operating when he
7  came to the property, but with the addition of
8  the tipple directly adjacent to his property.
9  He believes that its operation makes -- is a
10  nuisance and he --
11        THE COURT:  Well, it's the
12  tipple; it's when it's operated; it's the
13  removal of the trees that were a barrier before.
14  I mean, those are some of the -- the dust
15  created, the noise.
16        When is the tipple operated?  Do
17  you know?
18        MR. JAMIESON:  It is operated at
19  various times of the day and night when it is
20  most sensible to do so under the railroad's
21  schedule, given the train -- the train schedules
22  going north and south over the main line.  And
23  it happens -- it does happen in the wee morning
24  hours; it happens during the day; it happens
25  virtually any time, but it is dependent, heavily

Page 11

1  dependent on the railroad's schedule and other
2  activities that are happening on the railroad's
3  line.  And that is why this whole question of
4  whether State regulation of the operation of the
5  tipple can occur or whether the jurisdiction is
6  exclusively that vested with the Surface
7  Transportation Board.
8        And it's no question that this is
9  transportation under Section 101.2.  It defines
10  transportation as a locomotive, a car.  We have
11  locomotives being used in this operation.  We
12  have cars being used in this operation.  A
13  facility or equipment of any kind, and this is
14  certainly a facility or equipment of some kind.
15  It's of the railroad-loading kind.  That is
16  related to the movement of property by a rail
17  regardless of ownership.  And of course this is
18  related to the movement.  In fact, you don't
19  move this gravel unless it's loaded.
20        It is our position that there is
21  -- this is so quintessentially a transportation
22  function of the railroad that this falls
23  definitely within the jurisdiction of the
24  Surface Transportation Board and any State
25  regulation, which would include a suit for

Page 12

1  nuisance, and we've submitted case law on that
2  particular topic.
3        A suit for nuisance seeking
4  remedies does fall within the ambit of that
5  which is preempted by the ICCTA.  This lawsuit
6  must be referred to the Surface Transportation
7  Board and any remedies and the regulation of the
8  tipple should be -- the jurisdiction for that is
9  best and completely within the control of the
10  Surface Transportation Board.
11        That issue is dispositive of all
12  the issues that we have before you today.  We
13  have a motion to dismiss in favor of the Surface
14  Transportation Board, and I think that if there
15  is jurisdiction, that that is what must happen.
16        And then, secondly, we have a
17  motion to remand and, once again, I think the
18  case law states that it's difficult to imagine a
19  more definite statement of -- sweeping statement
20  of federal jurisdiction than this one.  It
21  would -- the document of complete preemption
22  would mean that it is removable and therefore we
23  would not -- it should not be remanded to State
24  court.
25        Your Honor, I think that there

Page 13

1  are probably some cases that you've read that
2  you probably have questions about.  I think one
3  would be the City of Milford -- or the Town of
4  Milford, the other would be Hi Tech, and the
5  third might be the West Coelese ph) case.  Let
6  me distinguish those cases very carefully.
7        In those cases you had a railroad
8  for another company coming to the Surface
9  Transportation Board for Federal court saying,
10  this public entity cannot regulate all of the
11  activities that happen in a particular facility.
12  And those activities included things like
13  driving the trucks at all time of the day or
14  night into the property, unloading the property,
15  sorting, grading then reloading on the train
16  cars.  And it is the sweeping nature of the
17  relief sought by the railroad, and/or the other
18  party in those cases, which is very distinct
19  from what we are seeking to have subject to the
20  Surface Transportation Board in this case.
21        The -- we are not saying that the
22  other activities that occur on Colaska's gravel
23  pit are subject to the regulation by the Surface
24  Transportation Board.  Rather we are saying only
25  this tipple and train cars being loaded within

4 (Pages 10 to 13)

Page 14

1  the right-of-way are subject to the Surface
2  Transportation Board's exclusive jurisdiction.
3  And so it's a very different and very limited
4  application of jurisdiction that we are seeking.
5          We are not saying that cutting
6  down trees outside the right-of-way, for
7  instance, to build the facility -- certainly if
8  the trees were cut down to build the facility in
9  the right-of-way, that would certainly be -- or
10  if they were needed in order to build the
11  facility, that would fall within transportation,
12  the definition of transportation. But other --
13  other cutting of trees or other operations that
14  occur on the other -- it's a very large pit, as
15  you can tell from the photographs -- other
16  operations that occur would not be subject to
17  the Surface Transportation Board's exclusive
18  jurisdiction, and that's not what we're seeking
19  to have this Court do.
20          So we are asking this Court to do
21  something which is peculiarly related to rail
22  transportation. It would be as if we had a
23  stairway that we used to load passengers and the
24  plaintiff were saying -- the plaintiff was
25  saying, I don't like this stairway or the

Page 15

1  stairway ought to be painted a different color
2  or it should be regulated in a different way.
3          THE COURT: Let me ask you: I
4  mean, you've hit upon a point, a question I
5  have. Isn't there a difference, though, if it's
6  your stairway versus a private company's
7  stairway? Because this tipple and the act of
8  loading the gravel is not the railroad's
9  activity; it's a private company's activity.
10          MR. JAMIESON: Well, actually,
11  that's an incorrect assumption, and I apologize
12  if the facts aren't clear. But it takes two to
13  tango; it takes two to load. You can't load
14  these cars without the cars being underneath and
15  being moved by the Alaska train crews. The
16  tipple doesn't function except when the cars are
17  underneath it receiving gravel. It is a pure
18  loading function and whether or not it's owned
19  by Colaska, the tracks are owned by and were
20  jointly built by the railroad and are retained
21  by the railroad and by Colaska.
22          The tipple, yes, is owned by
23  Colaska, but the statute, Section 101.2B9,
24  specifically says, transportation includes
25  property, facility, instrumentality or equipment

Page 16

1  of any kind related to the movement of
2  passengers or property regardless of ownership
3  or ambient consuming use. So this falls
4  squarely within that definition of
5  transportation.
6          THE COURT: Does that include,
7  then, the actual loading of the gravel onto the
8  conveyor that gets it to the tipple?
9          MR. JAMIESON: My co-counsel
10  pointed out that the definition also includes
11  services related to that movement, including the
12  receipt, delivery, elevation, et cetera.
13          THE COURT: So I guess what I'm
14  trying to understand is, then, under that
15  statutory definition where's the line? I mean,
16  is it just when the gravel is falling out of the
17  tipple into your car, or is it when the -- I
18  assume it's by a front end loader is loading it
19  somehow onto the conveyor that is getting it to
20  the --
21          MR. JAMIESON: There are
22  activities on -- there are two business ends of
23  the tipple. One is the end where the material
24  is stockpiled and then proceeds up a conveyor
25  belt, and the other is what we call the business

Page 17

1  end where it dumps into. All of that is -- the
2  tipple equipment itself that is used has one
3  purpose.
4          The only reason it exists is to
5  put gravel into railroad cars to take them
6  somewhere as rail transportation. And the only
7  reason that it exists is to do that, and all of
8  that is covered by it. Now, blasting that might
9  occur elsewhere on the property, operations that
10  might occur, any trucking operations that might
11  occur on the property, if they deliver gravel to
12  trucks that are then taken somewhere else, those
13  are all things that would not be and we're not
14  seeking the Court and the --
15          THE COURT: Can you read the
16  definition to me again, please?
17          MR. JAMIESON: Sure. I can put
18  it up. Let's see. Here it is. What we have
19  is, Transportation -- can you see that, Your
20  Honor?
21          THE COURT: Yes.
22          MR. JAMIESON: It includes a
23  locomotive, car, vehicle, vessel, property,
24  facility, instrumentality or equipment -- so
25  those are things that we're talking about

Northern Lights Realtime & Reporting, Inc
(907) 337-2221

Page 18

```
1   here -- of any kind related to the movement of
2   passengers or property -- so it's related to the
3   movement of property -- by rail regardless of
4   ownership or concerning the use.  And we have --
5   Colaska owns the tipple facilities.
6           They also have a permit, an
7   agreement to use them on our right-of-way, in
8   our right-of-way for our cars.  And then it also
9   includes services related to that movement,
10  including receipt, delivery and handling.
11          So this falls -- the tipple and
12  the equipment that is involved in operation of
13  the tipple and the equipment that's involved in
14  operation of the train, the gravel, is squarely
15  transportation.  And that occurs as a
16  coordinated effort, as an integrated effort by
17  Colaska on one hand and the Alaska Railroad on
18  the other.
19          THE COURT:  So, getting back to
20  my earlier question:  Where are you drawing the
21  line at the other end of the tipple?  Where is
22  your line under the definition?
23          MR. JAMIESON:  Well, I think that
24  that would be something that the Surface
25  Transportation Board could certainly flesh out
```

Page 19

```
1   in greater detail, but as a preliminary matter,
2   what we are talking about is transportation and
3   where that line gets drawn should be something
4   that should be a subject for further
5   proceedings.
6           Certainly, when you're on the
7   other end of the property digging up gravel or
8   blasting or whatever you might do on the other
9   -- cutting down trees on the other side of the
10  property away from the tipple, that wouldn't be
11  covered.  But when you're talking about -- when
12  you're talking about turning the tipple on and
13  turning it off and loading cars, that definitely
14  is covered.  Actually getting material into the
15  tipple so that it can be loaded, that would be
16  covered.  And where that line is drawn is
17  something for the Surface Transportation Board
18  to decide.
19          THE COURT:  Thank you.
20          MR. JAMIESON:  So I think, Your
21  Honor, what we are seeking is something that is
22  very squarely transportation related.  It's
23  without question transportation.  It's without
24  question by the railroad.
25          And what we are not seeking is a
```

Page 20

```
1   sweeping order that the City of Wasilla may not
2   regulate the gravel pit.  We're not seeking
3   that.  We are saying Mr. Coyle wants to tell us
4   when we can turn the tipple on and when we can
5   turn the tipple off, when we can load and when
6   we can't load.  Those sorts of things, those
7   sorts of complaints -- and he wants damages for
8   that.  Those sorts of things are solely within
9   the ambit and purview of the Surface
10  Transportation Board.
11          Thank you, Your Honor.  If you
12  have any other questions, I'll be happy to
13  address them.
14          THE COURT:  I don't yet, but I
15  may.
16          MR. PERKINS:  Your Honor, Doug
17  Perkins with Hartig Rhodes for the plaintiffs,
18  Mr. and Mrs. Coyle.
19          Perhaps I was not fully
20  understanding the railroad's and Colaska's
21  joining position on the motion, but I thought
22  they were saying this case was all about rail
23  transportation.  It sounds now, however, like
24  they're conceding that there are certain parts
25  of the Coyles' complaint that must be remanded
```

Page 21

```
1   to State court because they don't have anything
2   to do with rail transportation, including Count
3   1 which has to do with trespass by Colaska
4   employees and Colaska's gravel pit customers
5   that's coming to buy gravel and as well the
6   expansion of the gravel pit beginning roughly in
7   2003 after the Coyles had purchased their
8   property in 1997.
9           And the Court may recall from the
10  pleadings that those claims center around an
11  increase in activity.  Certainly the tipple was
12  never there.  There was a nice tree buffer which
13  used to insulate the Coyles' house and sawmill
14  operation from the gravel pit which they knew
15  was beyond, but which they had no idea this
16  nuisance would eventually come to them in the
17  way it did.
18          The picture, by the way, is
19  interesting and certainly depicts the side view
20  of the tipple.  We don't have pictures that show
21  the front of the tipple, though.  This is a
22  massive structure.  If you're sitting on the
23  Parks Highway looking at it, the Coyles' house
24  is dwarfed by this huge appendage sitting in the
25  background.  It really is quite a presence.
```

1  As I say, it was not there in '97
2  when they bought the property, but it's
3  certainly there at all hours of the day and
4  night. But it sounds like, as I said, Your
5  Honor, the cross-motion must be granted as to
6  part -- as to those claims which have nothing to
7  do with rail transportation.
8  There's two prongs to this issue,
9  though, Your Honor. This is the introductory
10  part of 49 USC Section 105.01B1 where it talks
11  about two prongs that this Court must address
12  here today; the jurisdiction of the Board over
13  transportation by rail carriers as noted in the
14  briefing in which we discussed the two STB cases
15  which kicked back not just the private business
16  partners' side of those cases, but the whole
17  thing. They said, we don't have jurisdiction
18  over any of this even though clearly they would
19  otherwise have jurisdiction over the
20  railroad's -- the rail carriers involved in
21  those two cases. They said, and I believe this
22  is in the Auburn case too, but certainly it's
23  right there in the statute.
24  There's two things that we look
25  at -- transportation by rail carriers. I don't

1  think they qualify under either, Your Honor.
2  Transportation is equipment of any kind related
3  to the movement by rail. I think they're taking
4  the line drawing a little bit beyond its logical
5  extreme.
6  Any customer of the railroad can
7  argue that when they load up a package, drive
8  down to the railroad depot and hand it to the
9  clerk that they're involved in the movement by
10  rail because eventually that package is going to
11  be loaded aboard a train and transported to
12  someplace beyond. Where do you draw the line?
13  I think Your Honor has hit the
14  nail on the head. You have to draw the line at
15  the logical spot. Is it where the gravel falls
16  out of the chute ending up in the rail car which
17  is clearly protected? Is it the hopper which
18  leaves the chute? Is it the conveyor which
19  leaves the hopper? Is it the front end load
20  that scoops the big pile -- or scoops from the
21  big pile and loads it onto the conveyor? Does
22  it include the employee operating the front end
23  loader? Does it include the mound of gravel
24  which is scooped from?
25  Drawing the line at any place

1  prior to when the gravel leaves the custody and
2  control of Colaska and where it comes within the
3  custody and control of the railroad is the only
4  logical place to draw that line. Colaska owns
5  the gravel pit. Colaska alone operates the
6  gravel pit. Colaska alone built the tipple on
7  the gravel-loading facility. Colaska alone
8  operates the tipple on the gravel-loading
9  facility. The only commonality -- and from
10  that, of course, the railroad owns the cars.
11  The railroad owns the main line tracks. They're
12  the only one that has the right to operate on
13  the side track, the loading track.
14  The only blended area of overlap
15  between where the unprotected activities of
16  Colaska end and the protected activities of the
17  railroad begin is the fact that Colaska
18  participated with the railroad in building the
19  side track and I guess they may even own part of
20  the side track, but they can't operate it.
21  They're not a rail carrier.
22  So that's where the second prong
23  comes in. This is not movement by rail; this is
24  movement by tipple through the air into a rail
25  car. But even if it were transportation, even

1  if you gave them the benefit of the doubt, drew
2  the line let's say at the hopper for the tipple
3  itself, if you were to draw the line where the
4  conveyor ends and where it enters the hopper and
5  flows down to the chute. And forgive me if I'm
6  describing the mechanism wrong. I'm just kind
7  of using my intuition on how the apparatus
8  actually works.
9  But even if you drew the line
10  there and said, yes, this is transportation,
11  it's not by rail carrier. There's no dispute
12  that the railroad does not operate the tipple or
13  the gravel-loading facility. It's because of
14  cases like this the Surface Transportation Board
15  in frustration says, I'm sorry, this is a matter
16  involving the railroad and a private business
17  partnership with a private company; we don't
18  have jurisdiction over this. And, likewise,
19  this Court does not have subject matter
20  jurisdiction either.
21  That's all I have, Your Honor.
22  THE COURT: Thank you. I figured
23  you might have a response.
24  MR. JAMIESON: Yeah. I think
25  Counsel is drawing the line very restrictively

Page 26

1  in the face of a statutory scheme that is very
2  expansive and includes more than the physical
3  act of somewhere two feet above the rail car.
4  That's when -- certainly as the gravel is
5  dropping, that's when the Surface Transportation
6  Board kicks in. I think that is just directly
7  contrary to the face of the statute and all the
8  cases that have interpreted.
9        The statutory definition of
10  transportation is very broad, deliberately so,
11  so that we don't get into the situation of you
12  can regulate the railroad out of existence by
13  simply regulating every step until something
14  actually sits on a rail car. And that's why the
15  statute defines transportation as wharf, pier,
16  dock, yard, property, facility, instrumentality,
17  equipment of any kind related to the movement of
18  passengers or property regardless of ownership
19  and services related to that movement, including
20  receipt of delivery, elevation.
21        That's part of what's going on
22  here, is the gravel is being elevated and
23  dropped. Transfer, in transit, refrigeration,
24  icing, demolition, storage, handling and
25  interchange of passengers and property. A very

Page 27

1  expansive definition of what constitutes
2  transportation. And as far as by railroad, it
3  is very much disputed that the railroad
4  participates each and every time that the tipple
5  is in operation. The railroad participates; it
6  has to. You can't turn the tipple on without
7  having a moving rail car underneath it.
8        The operation is a well-oiled
9  machine and it requires close coordination
10  between the tipple and the train crew. The
11  train crew moves at a very slow rate of speed
12  underneath the tipple and then the tipple is
13  turned on as the beginning of the open rail car
14  comes directly underneath it, and then it
15  proceeds along the line to the rail car and then
16  stops for the gap between rail cars and then
17  commences again and it fills up the next car and
18  moves very slowly as the train is moving the
19  entire time. It's being operated by train crews
20  the entire time. And that is exactly how this
21  operation occurs.
22        How that is not the railroad
23  doing it when the railroad is in complete
24  control of its cars through the entire process,
25  that is very much disputed. This is a railroad

Page 28

1  operation and we think that, again, it doesn't
2  matter that the railroad doesn't own the tipple,
3  but certainly the tipple is involved in the
4  movement of goods by rail and would not exist
5  but for that.
6        This is very narrowly something
7  that falls squarely within the jurisdiction
8  conferred by the ICCTA. As far as partial
9  remand, Your Honor, we think that because the
10  closeness of the question of when does -- and
11  the interrelatedness of the question of when
12  does STB jurisdiction end and when is it
13  permissible to regulate other activities at the
14  gravel pit, but we think this is a perfect case
15  in which we made the argument and cited the
16  authorities for supplemental jurisdiction under
17  20 USC 1367A. This definitely qualifies and
18  meets all of the prongs for Your Honor retaining
19  supplemental jurisdiction pending the Surface
20  Transportation Board -- the proceedings before
21  the Surface Transportation Board.
22        I believe those are the -- and as
23  far as drawing the line, Your Honor. Your Honor
24  asked the question and Counsel asked the
25  rhetorical question, where do you draw the line?

Page 29

1  Well, it seems to me the Surface Transportation
2  Board does that all the time and is particularly
3  adept at that. They are charged with just this
4  sort of dispute and this sort of issue. That's
5  what they were set up to do and that's why
6  jurisdiction is vested in them.
7        We do think Your Honor does have
8  jurisdiction to make that decision and you have
9  the authority to make that decision, but we
10  think that a proper exercise of your
11  jurisdiction would be to defer to the Surface
12  Transportation Board to tell you when that line
13  and where that line should be drawn.
14        THE COURT: Thank you.
15        MR. PERKINS: May I be heard,
16  Your Honor?
17        Under the ICCTA the railroad
18  enjoys the protection of broad preemption of
19  state and local regulations. No question about
20  it. They enjoy broad protections under the
21  ICCTA, but in order to get under the ICCTA in
22  this case there's a very limited test. They
23  must show that it's transportation by rail
24  carrier. It'll have transportation by a rail
25  carrier.

8 (Pages 26 to 29)

1    Even if you said that the
2  railroad doesn't have to own the tipple, they
3  sure have to use it.  And I don't think that --
4  first of all, there's no evidence in the record
5  that there has to be a moving railroad that's
6  loaded.  I mean, that may intuitively ring true,
7  but I don't know.  There's no evidence on that,
8  so does there have to be an engineer pulling a
9  load forward so that they have to go on and off
10  the tipple as they pull forward?  I don't know.
11    But, in any event, I don't think
12  that that kind of activity qualifies as
13  operation of the tipple.  I think that qualifies
14  as operation of the locomotive and the rail
15  cars.  The person taking the package down to the
16  railroad depot isn't just left to their own
17  devices, take their package out there and throw
18  it in a box car.  There has to be somebody there
19  to take the box from them, charge them the rail
20  -- the transportation charge.  There has to be
21  somebody to actually go and deliver it into the
22  box car so that it's transportable, but that
23  doesn't mean that this person loading the
24  package is entitled to protections of the ICCTA.
25  It certainly, you know, go to the post office

1  there has to be somebody to wait on you.  That
2  doesn't mean that the protections of the U.S.
3  Post Office extend to the post office's
4  customer.
5    That's all I have.  Thank you.
6    THE COURT:  Thank you.
7    MR. PERKINS:  Your Honor, I'm
8  sorry.  Excuse me.  I forgot one last thing that
9  -- excuse me for interrupting, Your Honor.
10    Speaking on the issue of the
11  claims that must be remanded.  I'd forgotten to
12  mention until Mr. Jamieson was addressing the
13  Court with his responsive remarks that the
14  railroad has filed counterclaims against the
15  Coyles for encroachments of their property on
16  the railroad right-of-way.
17    THE COURT:  About four feet or
18  something like that?
19    MR. PERKINS:  Yeah.  I mean,
20  those things are not, as far as I know, I don't
21  think it would be hard to come within the
22  jurisdiction of the Surface Transportation
23  Board.  That's just two private individuals --
24  this case is a private individual having
25  disputes with the neighbors, but that's not

1  something that has to go to the Surface
2  Transportation Board.
3    Thank you.
4    MR. JAMIESON:  We're not seeking
5  the Surface Transportation Board to rule on the
6  counterclaim as it pertains to the Coyles'
7  house.  It does extend four feet and extends
8  completely within the right-of-way.  But that is
9  an issue that is not a Surface Transportation
10  Board issue, but it's related and we felt that
11  it was a compulsory counterclaim given the
12  nature of this action, so that's why we asserted
13  it here and are limiting the proffer just based
14  on the last item that Mr. Perkins indicated
15  might be in dispute.
16    I think he indicated that it was
17  intuitively true that you would have to have a
18  moving rail car in order for the tipple to load
19  the cars.  If you would like, Your Honor, we can
20  put Mr. Hupprich on the stand and he's --
21    THE COURT:  You know, I think I
22  can figure out that to load one car you've got
23  to find a way to load the second car.  I don't
24  think that's an issue.
25    MR. JAMIESON:  Right.  I don't

1  think so either, Your Honor, but if you wanted
2  to ask questions of Mr. Hupprich about the
3  operation, he has observed it and he can testify
4  with first-hand knowledge about it.
5    THE COURT:  I don't think that's
6  necessary.
7    MR. JAMIESON:  Thank you, Your
8  Honor.
9    THE COURT:  Sir, do you want to
10  add anything?
11    MR. SCHMID:  No, Your Honor.
12    THE COURT:  All right.  Well,
13  thank you.  I'm going to take the motions under
14  advisement and I'll be issuing a decision as
15  soon as I can.
16    The other question I had in
17  reviewing the file in preparation for today's
18  hearing, there was a status court file a while
19  ago that did mention -- I don't know if it was
20  that status report or an earlier one, but my
21  question is this:  Have there been any efforts
22  at entering any kind of comprehensive settlement
23  discussions between the parties?
24    And it came to light when we
25  started talking about the counterclaims.  So



Page 34

1 there's a number of issues that are out there.
2 Have you all tried to sit down and sort through
3 some of this stuff and, you know, is there
4 anything I can do to help in that regard?
5           MR. JAMIESON:  There has been
6 discussion back and forth.  I don't think
7 there's been a single proceeding where parties
8 have focused totally on that issue and we're not
9 saying that might not be helpful, but currently
10 the process the parties have engaged in has sort
11 of run its course, Your Honor, and so here we
12 are.
13           THE COURT:  Okay.  And I'm not
14 sure exactly, you know, how to interpret that.
15           MR. PERKINS:  Your Honor, it was
16 very artfully worded.
17           THE COURT:  I'm not sure I
18 understand exactly what it means.
19           MR. JAMIESON:  That was the whole
20 point, Your Honor.
21           MR. PERKINS:  Your Honor, I don't
22 think that there's any reason to hold up a
23 decision if that's Your Honor's only concern
24 about that, too, but we have had some
25 discussions and I would say they've moved along

Page 35

1 since the last status report.  It's not an
2 impossibility, but it's not on the near horizon
3 anyway.
4           THE COURT:  All right.  Well,
5 look, let me just mention this while we're all
6 gathered here today.  And, you know, for Counsel
7 you've probably heard this a number of times
8 before, but it's well into the 90s and I think
9 that the statistics are somewhere about 93
10 percent of all federal civil cases end up being
11 resolved by way of some sort of negotiated
12 disposition short of going to trial, short of
13 dispositive motions work.  And, you know, it's
14 usually in everybody's interest in the sense
15 that the parties have the most control over the
16 outcome of the case.
17           From your perspective, you can
18 sit down -- both sides can sit down and work
19 something out versus, you know, throwing it to a
20 question to the Court or to a jury.  So I just
21 mention that.  If there's something that I can
22 do to help you in that regard, for instance, if
23 you at some point feel like you want a
24 settlement judge, you know, I can work with you
25 and get you a settlement judge.

Page 36

1           But hearing no request of that
2 sort from either side, I will just take these
3 motions under advisement and issue some rulings
4 and if you change your mind at some point and
5 decide you would like some assistance, just let
6 me know.
7           MR. JAMIESON:  Thank you.
8           MR. PERKINS:  Thank you very
9 much.
10           THE CLERK:  This Court now stands
11 adjourned.
12 10:47:24
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 37

1           TRANSCRIBER'S CERTIFICATE
2
3           I, LESLIE J. KNISLEY, hereby certify
4 that the foregoing pages numbered 1 through 37
5 are a true, accurate, and complete transcript of
6 the requested proceedings in Case No.
7 3:05-cv-00221-TMB, Deet A. Coyle and Edward
8 Coyle vs. Colaska, Inc. and Alaska Railroad
9 Corporation, transcribed by me from a copy of
10 the electronic sound recording to the best of my
11 knowledge and ability.
12
13 January 12, 2007    _____
                        LESLIE J. KNISLEY
14
15
16
17
18
19
20
21
22
23
24
25

10 (Pages 34 to 37)